ROBERT GINSBERG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

DONALD GINSBERG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 72468, 72469. Filed March 31, 1961.

*Daniel Eisenberg, Esq.*, for the petitioners.
*William F. Chapman, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined that each petitioner is liable to the extent of $7,400, plus interest, as transferee of assets of his father and mother, Allen and Bess Ginsberg, for deficiencies in income taxes and additions thereto determined by the respondent against the transferors for the taxable years 1943 through 1945 as follows:

| Year | Income tax | Sec. 293(b), additions to tax |
| --- | --- | --- |
| 1943 | $25,130.15 | $12,565.08 |
| 1944 | 43.88 | 1,375.52 |
| 1945 | 3,552.69 | 1,776.35 |

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioners are the sons of Allen and Bess Ginsberg, and are residents of the Borough of Brooklyn, New York City.

The above liabilities of Allen and Bess Ginsberg for income taxes and additions to tax were the subject of petitions filed with this Court on August 19, 1953, in Docket Nos. 50150 and 50151. In those cases this Court entered decisions on May 3, 1955, pursuant to stipulations of the parties, that there were deficiencies in tax and additions to tax under section 293(b) of the Internal Revenue Code of 1939, in the amounts stated above (except that in Docket No. 50150 relating to the year 1944, the amount of deficiency in tax was greater than shown above, a portion of the deficiency in tax having been paid on June 2, 1955). The above liabilities were assessed against Allen and Bess Ginsberg on June 2, 1955. Such liabilities, together with interest, remain due and unpaid.

As of December 21, 1953, Allen Ginsberg owned 50 shares of stock of the Allen Nevins Packing Corp., hereinafter called the corporation, which represented all of the outstanding and issued shares. This cor-

poration was organized under the laws of the State of New York on October 28, 1946.

Allen Ginsberg caused stock certificates of the corporation to be made out in the names of the petitioners as follows: On December 22, 1953, certificate No. 4, representing 7½ shares of stock was made out to Robert Ginsberg and certificate No. 5, representing 7½ shares of stock was made to Donald Ginsberg; on December 10, 1954, certificate No. 7, representing 6 shares of stock was made out to Robert Ginsberg and certificate No. 8, representing 6 shares of stock was made out to Donald Ginsberg; and on January 20, 1955, certificate No. 10, representing 5 shares of stock was made out to Robert Ginsberg and certificate No. 11, representing 5 shares of stock was made out to Donald Ginsberg. All these certificates of stock bore Federal transfer stamps. During 1953, 1954, and 1955 Robert Ginsberg was secretary of the corporation and the certificates bore his signature as secretary, as well as the signature of Allen Ginsberg as president. On each of the above dates a new stock certificate was issued to Allen Ginsberg representing the remaining balance of the outstanding stock.

Upon each of the above dates Robert Ginsberg, at the direction of his father, went to the law offices of Hoffman and Rubin and signed the above stock certificates. Irving Hoffman, the attorney who had organized the corporation, kept in his possession the minute book of the corporation and the stock certificate book, together with the above certificates issued in the names of the petitioners, until February 1958, at which time he surrendered them to Allen Ginsberg. Hoffman also kept in his possession over that period the certificates which had been issued in the name of the father, Allen Ginsberg. Upon receipt of those stock certificates in February 1958, Allen Ginsberg delivered possession thereof to his attorney, Daniel Eisenberg, in behalf of Allen Ginsberg, in whose possession they have remained ever since.

No consideration was involved in the transactions whereby the shares of stock were made out in the names of the petitioners. At the times the certificates were made out to the petitioners, Allen Ginsberg and Bess Ginsberg intended to make true and valid gifts to them.

The shares of stock of the corporation had the following value at the times indicated:

| | Per share |
| --- | --- |
| December 1953 | $378.63 |
| December 1954 | 386.88 |
| January 1955 | 396.85 |
| Nov. 15, 1957 | 434.42 |

On December 22, 1953, December 10, 1954, and January 20, 1955, the liabilities of Allen and Bess Ginsberg exceeded the amount of their assets.

On June 21, 1957, the respondent mailed a letter to each of the petitioners notifying each that it was proposed to assess against each

the amount of $7,400, plus interest as provided by law, constituting his liability as transferee of assets of Allen and Bess Ginsberg, for income taxes due from the latter. This was the usual "30-day letter" in which it was stated that the recipient might file a protest and have a conference within a 30-day period. Therein it was specifically stated that this letter did not constitute a statutory notice of transferee liability, but that if, upon the expiration of the 30-day period, the recipient did not agree to the proposed determination or file a written protest, a statutory notice would be sent as provided by law.

On November 15, 1957, Donald Ginsberg executed and delivered to Allen Ginsberg a document providing as follows:

KNOW ALL MEN BY THESE PRESENTS that the undersigned does hereby assign, transfer and set over unto ALLEN GINSBERG, eighteen and one-half (18½) shares of the capital stock of ALLEN NEVINS PACKING CORP., as contained in the following certificates:

 Certificate No. 5 for 7½ shares
 Certificate No. 8 for 6 shares
 Certificate No. 11 for 5 shares

and I do hereby irrevocably constitute and appoint ALLEN GINSBERG to transfer the said stock on the books of the said ALLEN NEVINS PACKING CORP. with full power of substitution in the premises.

On the same date Robert Ginsberg executed and delivered to Allen Ginsberg a similar document relating to the certificates in his name.

On the same date Donald wrote the following letter to his father:

I am herewith enclosing an assignment of 18½ shares of stock in the Allen Nevins Pkg. Corp.

As you know, I never had possession of these shares, and until very recently had no idea that these shares had been transferred to me. Since I never received these shares, I cannot return them to you. They are probably in your lawyer's office.

Neither Robert nor Donald endorsed the stock certificates and the stock in question was not transferred to Allen Ginsberg on the corporate records.

During 1953 and 1954 and during January 1955, the petitioner Donald Ginsberg had not reached majority. From 1951 through 1958 he was away from New York, where his parents resided, attending college and medical school, except during summer months and infrequent vacations. He did not become aware of the issuance of the stock certificates in his name until he received respondent's letter of June 21, 1957.

By letter dated January 9, 1958, the respondent notified each petitioner of his determination that each was liable, to the extent of $7,400, plus interest, as transferee of assets of Allen and Bess Ginsberg, for the unpaid deficiencies in tax and additions to tax of Allen and Bess Ginsberg. In each instance he stated:

Inasmuch as the value of assets received by you during the years 1953, 1954 and 1955 consisting of shares of stock in the Allen Nevins Packing Corp., amounted to $7,400.00 your liability as Transferee is limited to that amount.

OPINION.

The petitioners' principal contention is that the respondent has failed to show that there was a transfer of the stock of the corporation to them, and that hence the respondent has failed to sustain the burden, imposed upon him by section 1119(a) of the Internal Revenue Code of 1939 [1] and by the similar provision of section 6902 of the Internal Revenue Code of 1954, of showing that they are liable as transferees under section 311 of the 1939 Code [2] and the similar provision of section 6901 of the 1954 Code.

The petitioners do not deny, indeed it is stipulated, that at the times Allen Ginsberg caused the stock certificates to be made out in the names of the petitioners, Allen Ginsberg and Bess Ginsberg intended to make valid and true gifts to their sons, the petitioners. It is argued, however, that there was no delivery of the stock to the petitioners, that they did not accept the stock, and that hence the intended gifts were not completed, with the result that the petitioners did not receive assets from their parents so as to render them liable as transferees.

The liability, at law or in equity, of a transferee of property of a taxpayer, as referred to in section 311 of the Internal Revenue Code of 1939 and section 6901 of the Internal Revenue Code of 1954, is to be determined by reference to State law. *Commissioner* v. *Stern,* 357 U.S. 39. In *Beaver* v. *Beaver,* 117 N.Y. 421, 22 N.E. 940, the requisites of a valid gift inter vivos are stated as follows:

There must be on the part of the donor an intent to give, and a delivery of the thing given, to or for the donee, in pursuance of such intent, and on the part of the donee acceptance. The subject of the gift may be chattels, choses in action, or any form of personal property, and what constitutes a delivery may depend on the nature and situation of the thing given. The delivery may be symbolical or actual, by actually transferring the manual custody of the chattel to the donee, or giving to him the symbol which represents possession. * * * The acceptance also may be implied where the gift, otherwise complete, is beneficial to the donee.

[1] SEC. 1119. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES.

(a) BURDEN OF PROOF.—In proceedings before the Tax Court the burden of proof shall be upon the Commissioner to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.

[2] SEC. 311. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds):

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.

See *In re Babcock's Estate*, 147 N.Y. Supp. 168; *In re Spain's Estate*, 46 N.Y.S. 2d 789; *Hillary Holding Corp.* v. *Brooklyn Jockey Club*, 88 N.Y.S. 2d 198; and *In re Kaufman's Estate*, 107 N.Y.S. 2d 681.

It has been held that the transfer of title to stock on the corporate records stands in the place of delivery. In *Peets* v. *Manhasset Civil Engineers*, 68 N.Y.S. 2d 338, it is stated:

Ward was a stockholder for not only are there many references to that fact in the minutes but the stock certificate was issued in his name and in the absence of an indorsement, he is deemed to be the owner. Sections 164, 182, Personal Property Law. The fact that the certificate was found in Mr. Will's safe is not proof to the contrary. * * * However, even if Will had not delivered the certificate, and Ward had no knowledge of its existence, Ward should still be regarded as the owner as to everyone excepting possibly Will himself. The transfer of the shares upon the books of the corporation clothed Ward with legal title. That act as stated in Matter of Babcock, 85 Misc. 256, 266, 147 N.Y.S. 168, 174 (affirmed 169 App. Div. 903, 153 N.Y.S. 1105, 216 N.Y. 717, 111 N.E. 1084) "stands in the place of a delivery. Such an act performs precisely the office which an actual delivery would perform if it were a chattel." See also Francis v. N.Y. & B. El. R. Co., 108 N.Y. 93, 15 N.E. 192, wherein it was written at page 97 of 108 N.Y., page 193 of 15 N.E.: "The transfer on the books of the company, and the issue of the new certificates, was a continuing affirmation by the corporation of ownership of the stock by the infants named in the certificates. * * *" The plaintiff in that case had stock issued in the name of his children but neither delivered the certificates to them nor informed them of the issuance of the stock. * * *

See also *Francis* v. *New York & B. E. R. Co.*, 17 Abb. N.C. 1, affd. 108 N.Y. 93, 15 N.E. 192, where the plaintiff had surrendered certain stock certificates to a corporation and had new certificates issued in the names of his three minor children, but kept the certificates in his safe and did not inform the children. It was there held:

This was a complete gift of the stock, so far as to permit the children to so elect when they arrived at the age of consent. The title was changed as to the plaintiff, and, if the children were adults, there would be no question but that the gift was completed. The donor had conveyed a title, and it was absolutely put out of the power of the donor to reclaim it. * * *

In view of the fact, as stipulated, that it was the intention of Allen Ginsberg to make valid gifts to his sons, we think it clear, under the above authorities, that his action in causing the corporation to issue certificates of stock in the names of the petitioners and the delivery thereof to the attorney, Hoffman, was sufficient to divest Allen Ginsberg of dominion and control over such stock and constituted the delivery requisite to the consummation of a gift. Hoffman thereafter holding the certificates on behalf of the petitioners.

There remains the question whether there was acceptance by the petitioners. Insofar as Robert is concerned, we think it clear that there was. He, of course, had knowledge of the issuance of the certificates in his name since he signed them as secretary of the corporation.

While he testified that the word "gift" was never used and that he did not think he had the right of disposition, he further testified that he knew that his father was involved in a tax matter and that the transfer of the stock was made to protect his father in that matter. Robert was thus a party to this attempt to protect his father, which would necessitate a transfer of title to the stock in accordance with the intent of the donor, as stipulated, to make valid and complete gifts. Robert acquiesced in the issuance of the stock in his name and in the holding of the certificates by the corporate attorney. It seems to us that there was clearly a completed gift of the stock to Robert.

Insofar as the petitioner Donald is concerned, the circumstances are quite different. At the times of issuance of the certificates of stock in his name he had not reached majority and was away from his father's home attending college and medical school. He specifically and unqualifiedly testified that at no time prior to June 1957, when he received the 30-day letter from the respondent, did he ever know anything about the transfers of the certificates in his name. He stated that his brother did not correspond with him while he was away, and that when he was at home in the summertime and on vacations his father never discussed the matter with him. We also interpret Robert's testimony as meaning that he never discussed the matter with Donald. While it may appear somewhat unusual that Donald would not have been advised by either his father or his brother of the action taken, we have no reason to doubt Donald's testimony. It is our conclusion, therefore, that there was no actual acceptance by Donald of the gift of stock.

The respondent relies upon the principle enunciated in *Beaver* v. *Beaver, supra,* and other New York cases, that acceptance may be implied in the case of a gift which is beneficial to the donee. It is argued on behalf of Donald, however, that a gift of the stock would not be beneficial to him in view of the transferee liability which the respondent has here asserted. We find it unnecessary to decide this question of implied acceptance, since in any event we think it obvious that there can be no gift, if, upon learning of the transfer, the donee renounces the gift.[3] On November 15, 1957, Donald executed a document purporting to assign, transfer, and set over to his father the stock which had been issued in his name. Accompanying it was a letter to his father emphasizing that until recently he had had no

---

[3] In 24 American Jur., Gifts, sec. 41, it is stated: "As a general rule, a gift to a donee without his knowledge, if made in proper form, vests the property in him at once, *subject to his right to repudiate it when informed thereof;* * * *. [Emphasis supplied.]"

In Brown, Personal Property, sec. 50 (2d ed.), it is stated: "Wherever the donee is not cognizant of the donor's intent to give, or is incapable of accepting it from some incapacity, the correct statement of the situation would seem to be that the gift takes effect immediately upon its execution by the donor *subject, however, to later repudiation by the donee.* * * * [Emphasis supplied.]"

See also *Miller* v. *Herzfeld,* 4 F. 2d 355 (C.A. 3), and *Goitstein* v. *Hodges,* 210 Iowa 272, 228 N.W. 93.

knowledge of the purported transfers and that since he had not received the certificates he could not return them. We think that the action taken by Donald amounted to a repudiation of the attempted gift. Although the record does not disclose why Donald waited from June until November to execute the document purporting to assign the stock back to his father, we think that in any event such delay was not unreasonable, and does not indicate that Donald had at any time during the interim accepted the gift. We are also of the opinion that the fact that the transfer took the form of a reconveyance does not, under the present circumstances, indicate an admission that title had theretofore vested in Donald. We accordingly hold that there was not a transfer of stock to Donald and that hence he is not subject to liability as a transferee.

It is further argued on behalf of the petitioner Robert that even if it be assumed that the stock had been transferred to him, he is relieved of any liability as a transferee because he reconveyed the stock to his father. It is contended that in such circumstances the proper remedy under State law would be an action *in rem* against the assets which had been reconveyed to the father and that no action against Robert would be appropriate, the stock at the time of reconveyance having a value in excess of its value at the time of conveyance to Robert, and there having been no interim earnings. The petitioner refers to the provisions of the statutes of New York relating to fraudulent conveyances (N.Y. Debt. & Cred. Law, art. 10, secs. 270–281).

In *Commissioner* v. *Stern, supra,* the Supreme Court made it clear that while the transferee provisions of the revenue acts and the internal revenue codes do not create or define a substantive liability (which must be determined by reference to State law), they do provide a substitute procedure by which the Government may collect its taxes, and that it was the purpose of Congress in enacting such provisions to collect the transferee liability in the same manner as in the case of the liability of the transferor-taxpayer, in lieu of resorting to an action *in rem* in an equity proceeding. Section 311 of the 1939 Code and section 6901 of the 1954 Code specifically provide that the liability, at law or in equity, of a transferee shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in tax. Therefore, the respondent must proceed against a transferee by first sending him a notice of transferee liability. See section 272(a)(1) of the Internal Revenue Code of 1939 and sections 6212 and 6213 of the Internal Revenue Code of 1954.

We have recognized that if a transferee reconveys the property to the transferor prior to the respondent's taking action to collect from the transferee, the transferee relieves himself of any liability, since the

retransfer purges the fraud from the original transfer, the return of the property serving to leave the creditor in the same position he was in prior to the original transfer. *Fada Gobins*, 18 T.C. 1159, affirmed per curiam 217 F. 2d 952 (C.A. 9). However, in *Louise Noell*, 24 T.C. 329, appeal dismissed 234 F. 2d 665 (C.A. 8), we held that where the reconveyance occurred after the issuance of the notice of transferee liability, the transferee is not relieved of liability. In that case we relied upon the general rule as stated in Glenn, Fraudulent Conveyances and Preferences (rev. ed.), sec. 57, that "if a transferee should surrender the property to the debtor, together with its interim earnings, *prior to institution of an attack by creditors*, he will be relieved of all liability. [Emphasis supplied]," and as stated in Wait on Fraudulent Conveyances and Creditors' Bills (3d ed.), sec. 176, that "If the party has accounted to the debtor for the proceeds of the property *before proceedings are taken against him by the creditor*, he cannot be forced to account for it over again. [Emphasis supplied.]" We concluded that the inference is inescapable that a retransfer after an attack has no such effect. Accordingly, we there concluded that the correct rule is that once the transferee has been given proper notice that the creditors of the transferor are holding the transferee liable, he makes further transfers at his peril. In the *Noell* case the taxpayer resided in Missouri, and it appeared that the general rule was applicable in that State. From an examination of the cases cited by the parties, and other New York cases, it is our conclusion that the general rule is applicable in New York. We have found no New York State case which would indicate that a reconveyance, after the institution of a creditor's suit, would serve to relieve the transferee of liability. See *Cramer* v. *Blood*, 57 Barb. 155, affd. 48 N.Y. 684, and *Wilds* v. *Williston*, 128 Misc. 654, 219 N.Y.S. 676, which are cited in Glenn, Fraudulent Conveyances and Preferences (rev. ed.), sec. 57, in support of the quoted statement of the general rule.

The question, then, is whether Robert reconveyed the stock to his father before the commencement of the respondent's action against him as transferee. Here the respondent issued a 30-day letter to the petitioner Robert on June 21, 1957, informing him that the respondent proposed to proceed against him as a transferee. On November 15, 1957, Robert executed a document purporting to convey the stock back to his father. On January 9, 1958, the respondent issued a statutory notice to Robert advising him of the determination of transferee liability. The respondent, on brief, seems to view the issuance of the 30-day letter as the commencement of the action. We find it unnecessary to decide whether such view is correct, since we think that certainly he commenced the proceeding no later than the time of

issuance of the notice of deficiency and in our opinion Robert had not, prior to that time, reconveyed title to the stock to his father.

McKinney's Consolidated Laws of New York, Personal Property, art. 5, sec. 162, provides that title to a certificate and to the shares represented thereby can be transferred only (1) by delivery of the certificate endorsed either in blank or to a specified person, or (2) by delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to transfer the shares.

At the time that Robert executed the purported assignment on November 15, 1957, the certificates of stock were outstanding in his name and, as previously stated, were being held by the attorney Hoffman for him. It was not until sometime in February 1958, that Hoffman made delivery of the certificates to Allen Ginsberg. Accordingly, we think there was not, until that time, the delivery which is requisite to the consummation of a transfer under the New York statutes. Nor was there a substitute for delivery in the form of a transfer of the shares upon the books of the corporation—indeed, the record indicates that up to the time of trial the certificates remained outstanding in Robert's name. It may be added that if there was any action taken to constitute Hoffman the agent for Allen Ginsberg to hold these particular shares, it has not been shown. Although the burden of proof in transferee cases is on the respondent, the burden of going forward with the evidence is shifted to the taxpayer to refute transferee liability once the respondent has made a prima facie showing of such liability by virtue of proving gratuitous transfers by the taxpayer. *Fada Gobins, supra,* and cases cited therein.

As stated previously, the reason for the rule that a transferee is relieved of liability as the result of a reconveyance is that the creditor is placed in the same position as he was prior to the disposition of the assets by the transferor. We think it clear that, as of the time the respondent issued the notice of transferee liability, he, as a creditor of the taxpayer transferor, was not in the same position he was in prior to the transferor's conveyance of the stock to Robert. The certificates of stock remained in the name of Robert and the taxpayer Allen Ginsberg had not taken delivery. Whether at that time the respondent had been advised of a purported reconveyance is not shown, but in any event we think that under the circumstances then existing the respondent was not in a position to proceed against the property as an asset of the taxpayer Allen Ginsberg.

Following the *Noell* case, we hold that Robert did not reconvey the stock to the transferor prior to the issuance of the notice of transferee liability and that therefore he is not relieved of his liability as transferee. The petitioner contends that this conclusion may result in a double collection by the respondent, namely, a collection of the

transferee liability from Robert and, in addition, a proceeding by the respondent against the retransferred property in the hands of the original taxpayer. Suffice it to say that the question of the propriety of proceeding against the retransferred property in the hands of Allen Ginsberg is not before us and we express no opinion with respect thereto.

*Decisions will be entered under Rule 50.*