ERIS BERNARD McLELLAN, Transferee, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ERIS W. and FRANCES McLELLAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McLellan v. Commissioner
Docket Nos. 358-71, 359-71.
United States Tax Court
T.C. Memo 1975-15; 1975 Tax Ct. Memo LEXIS 355; 34 T.C.M. (CCH) 62; T.C.M. (RIA) 750015; January 28, 1975, Filed Robert T. Jackson and William D. Brooks, for the petitioners. J. Leon Fetzer, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal income tax of Eris W. and Frances McLellan for the taxable year ended December 31, 1966, in the amount of $33,727.42 and an addition to tax under section 6653(a), I.R.C. 1954[1] in the amount of $1,686.37. Respondent determined that Eris Bernard McLellan was liable as a transferee for this deficiency in income tax and addition to tax for the year 1966 of Eris W. and Frances McLellan. Although the only year for which a deficiency was determined in the tax of Eris W. and Frances McLellan was 1966, respondent recomputed the income tax of petitioners for 1963 through 1965 *357 and also redetermined the loss carryback of petitioners for the year 1966 to these prior years. These recomputations were made since the entire deficiency determined in the income tax of Eris W. and Frances McLellan for the year 1966 was as a result of recapture of investment credit which had been taken in prior years. The petition of Eris W. and Frances McLellan assigned error in the determination of respondent for each of the years 1963 through 1966. However, at the trial petitioners Eris W. and Frances McLellan conceded all of the issues raised by the pleadings in their case except the issue of the deductibility in 1965 as a business expense of $4,464.62 and in 1966 of $110.15 paid as premiums for credit life insurance. Therefore, the only issues remaining in these cases for decision are (1) Whether petitioners Eris W. and Frances McLellan are prohibited from deducting premiums paid by Eris W. McLellan for credit life insurance by the provisions of section 264(a)(1), and (2) whether Eris Bernard McLellan is liable as a transferee for the deficiency in tax and addition to tax for the year 1966 of Eris W. and Frances McLellan. *358 FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Eris W. (hereinafter McLellan) and Frances McLellan are husband and wife and resided in Vaiden, Mississippi at the time their petition in this case was filed. Petitioners filed their joint Federal income tax returns for the taxable years 1963 through 1966 with the district director of internal revenue at Jackson, Mississippi. Petitioner Eris Bernard McLellan (hereinafter Bernard) is the son of Eris W. and Frances McLellan and resided in Vaiden, Mississippi at the time his petition in this case was filed. Respondent, on October 16, 1970, mailed to Bernard a notice of transferee liability for McLellan's 1966 tax deficiency and addition to tax. McLellan, from sometime prior to and during the years 1963 through part of 1966, owned and operated as a sole proprietorship a general road and bridge construction business in Mississippi under the name of McLellan & Randle. His work was primarily for the State of Mississippi. In mid-1965, McLellan encountered delays in shipping equipment to a new construction site, had to complete work of a subcontractor who had gone broke, and was delayed for 15 days *359 at a new job site because of lateness of a clearing contractor in preparation of the site. These delays were causing McLellan difficulty when in September 1965 Hurricane Betsy destroyed parts of a job which was practically completed for the Mississippi State Highway Commission. McLellan was unable to repair the damage prior to the usual winter stoppage of work in November. As a result he could not collect payment from the State of Mississippi on this and five other still uncompleted contracts. In the latter part of 1965 he had borrowed all that he could. Even with these various reverses, McLellan hoped to complete his various jobs in progress in the spring at a cost of about $200,000, and thereby become entitled to receive payments that he estimated were due on the previously completed project in the amount of $700,000 plus over a million dollars in total for completion of uncompleted jobs. Bernard who was 32 years old in November 1974, granduated from Delta State College in Cleveland, Mississippi in 1964 with a B.S. degree in business administration. He then entered on active duty with the Air National Guard and was stationed in Texas. On December 20, 1965, having completed his *360 tour with the Air National Guard, he returned home. Bernard had worked for his father doing bookkeeping during some of his summer vacations while he was in college and he had expected to become employed by his father's business when he returned home. Because his father did not receive work in the spring, he never became so employed. He remained unemployed until about July 1966 when he took a position with a company unrelated to his father's business. Starting about November 1965 and continuing during the winter of 1965-1966, McLellan received threatening letters from equipment creditors to whom he owed money. Some of these creditors began drawing drafts on his business bank account. Pursuant to a subcontract dated March 17, 1965, McLellan & Randle was a subcontractor under John H. Moon & Sons, Inc. (hereinafter Moon & Sons) on a Federal aid project in Newton County, Mississippi. On February 16, 1966, Moon & Sons wrote to McLellan & Randle, attention McLellan, stating: We are in receipt of a letter and statement from Faulkner Concrete Pipe Company, Hattiesburg, Mississippi, notifying us that you, as subcontractor on the above project, owe them a bill which is past due in the amount *361 of $50,643.09 for concrete pipe used on this project which was purchased by you from that Company between June 28, 1965, and November 23, 1965. We have also been advised by Noel's Material Company, Jackson, Mississippi, that you owe them approximately $18,000.00 for reinforcing steel used in this project. We have also been advised that you owe substantial amounts on unpaid bills for equipment rentals and parts incurred by you in connection with the performance of your work on this project. Your failure to pay currently the above bills is in direct violation of Paragraph 9 of the Subcontract between us above referred to and we herewith notify you that because of your breach of contract, we are withholding all monies otherwise due you until you present to us satisfactory evidence of payment of all bills incurred by you in connection with performance of this work. We further call to your attention that you have failed to correct the defaults complained of in our letter of October 19, 1965, and that we are sustaining substantial damages on account of your delay in having performed this work. Copies of this letter were sent to the Fidelity and Deposit Company of Maryland, Barry *362 and Brewer Insurance Service, and the attorney for Fidelity and Deposit Company of Maryland. At the time he received this letter from Moon & Sons, McLellan estimated that Moon & Sons owed him $200,000 under this subcontract and that McLellan & Randle owed Moon & Sons about $50,000 for another job on which Moon & Sons had done subcontract work for McLellan & Randle. After receiving the copy of this letter that was sent to it, the bonding company guaranteeing McLellan's jobs had McLellan & Randle put into "receivership" and took over the McLellan & Randle outstanding contracts. McLellan's creditors with security interests in the company's heavy equipment repossessed this equipment in March through July 1966. McLellan was unable to raise sufficient money in 1966 to redeem either his contracts or the equipment. He did not receive payment for any portion of work done on jobs in progress prior to the end of 1965, which contracts had been taken over in 1966 and completed by his bonding company. When the bonding company gave him an accounting in late 1968, it showed that he owed the bonding company about $680,000. McLellan never received the money he thought Moon & Sons owed him. Eris *363 W. and Frances McLellan filed in bankruptcy in 1971 and were discharged of all debts on October 1, 1971. On January 20, 1966, Eris W. and Frances McLellan transferred by warranty deed all real property owned by them in Carroll County, Mississippi, to Eris Bernard McLellan, including the house in which they resided. They continued to occupy this residence rentfree and still lived there in late 1974. The transfer consisted of 132.89 acres of land with buildings thereon which had a fair market value on the date of the transfer of $39,800. Prior to the transfer, Bernard had not received any income paid by the Government for not planting certain acreage but he did receive this income after the transfer. In August 1966, Bernard sold an acre of the land with a small house on it for $4,500 to R. W. Ellis. Both Bernard and his father endorsed Mr. Ellis' check but the proceeds of the check were retained by McLellan. Later, Mr. Ellis purchased two adjoining acres for which he paid Bernard $450. Subsequently, Bernard sold 15 acres of the land to J. W. Eades for $4,000 in cash. Bernard also received $3,000 insurance proceeds in June 1967 from a tenant-house on the property which had burned *364 down. Bernard turned over all these receipts to his father. In early 1968, Bernard mortgaged the main residence and land remaining for $12,500 to T. G. Kennedy. On February 1, 1968, Bernard wrote a check to his father in this amount. In May 1969, Bernard received a check for $1,584.97 representing the balance of payment on a parcel of the 132.89 acres which had been sold by McLellan prior to 1966 to one of his employees. Both Bernard and his father endorsed this check but McLellan kept the proceeds. McLellan & Randle maintained a checking account at the Merchants & Farmers Bank in Winona, Mississippi, and deposited $28,288.82 therein on May 1, 1965; $6,564.13 on May 14, 1965; $2,134.72 on May 25, 1965; and $259,654.23 on May 26, 1965. On February 10, 1966, McLellan deposited $20,016.41 in this account which was a payment from the State of Mississippi. McLellan and his wife maintained a checking account at the Merchants & Farmers Bank in Winona also, which account showed a balance of $485.51 on January 5, 1966. Petitioners made deposits into this account of $800 on January 15, 1966; of $500 each on April 5 and 16, June 22, August 20, September 24, and October 31, 1966; and of *365 $582.45 on November 30, 1966. On February 1, 1966, McLellan withdrew $100,000 from his McLellan & Randle account. Bernard also maintained a checking account at the Winona branch of the Merchants & Farmers Bank which was the only bank account he maintained. On February 1, 1966, Bernard deposited $50,000 to his account. This $50,000 had been given to him by his father from the $100,000 withdrawn by his father from the McLellan & Randle account. On June 15, 1966, Bernard deposited $1,500 to this account and on December 8, 1966, deposited $1,400 to this account. He deposited $12,500 on January 16, 1968, $1,000 on May 1, 1968, and $2,000 on March 24, 1969. Bernard drew the following checks on his account in 1966 which represented amounts either paid for his father's account or turned over to his father: Date
Payee
Amount
Feb. 4
Farm Bureau Ins.
$ 315.22
Feb. 18
Cash
25,000.00
[1] Mar. 10 McLellan & Randle
5,000.00
Mar. 17
Cade-Davis Tubles Ford, Inc.
12.12
[1] Apr. 5 Cash
5,000.00
May. 2
McLellan & Randle
5,000.00
[1] June. 2 E. W. McLellan
500.00
[1] Aug. 3 McLellan & Randle
500.00
Aug. 4
Farm Bureau Ins.
111.00
[1] Aug. 19 McLellan & Randle
1,000.00
Sept. 24
E. W. McLellan
500.00
Oct. 29
E. W. McLellan
500.00
[1] Nov. 18 McLellan & Randle
1,000.00
Nov. 29
Hugh Potts Motor Co.
3,590.00
Total
$48,028.34
*366 Eris W. and Frances McLellan filed amended returns for the years 1963 through 1965 to offset past income by the carryback of a claimed net operating loss for the taxable year 1966 which they stated totaled $748,708.34. Respondent, in his notice of deficiency, reduced this loss to $5,895.15 as a result of various adjustments to the McLellans' income and made various adjustments in prior years' income. These adjustments included the disallowance of $4,464.62 and $110.15 for the years 1965 and 1966, respectively, of premiums paid for credit, life insurance because McLellan was "indirectly a beneficiary under the policies." Respondent recomputed petitioners' tax liability for the year 1966, as a result of recapture of prior years' investment credit to be as follows: Investment
credit as
Investment
recomputed, Taxable
credit
Sec. 47,
Amount year
allowed
I.R.C. 1954
recaptured
1962
$ 122.46
$ 0
$ 122.46
1963
5,061.55
0
5,061.55
1964
9,481.20
0
9,481.20
1965
19,062.21
0
19,062.21
Tax from recomputing prior year
investment credit in 1966
$33,727.42
*367 Respondent further determined an addition to tax of Eris W. and Frances McLellan for the year 1966 for negligence under section 6653(a) in the amount of $1,686.37. Respondent determined that Bernard was liable as transferee of the assets of McLellan for the deficiency of $33,727.42 and the addition to tax of $1,686.37 plus interest because of the land and cash received from his parents in 1966. OPINION Section 264(a)(1) provides that no deduction shall be allowed for premiums paid on any life insurance policy covering the life of any person financially interested in a trade or business carried on by the taxpayer, where the taxpayer is directly or indirectly a beneficiary under the policy. Respondent determined that McLellan was indirectly a beneficiary under certain credit life insurance policies. Although McLellan did not concede this issue, he introduced no evidence to overcome respondent's determination and made no argument on brief with respect to this issue. The burden to show error in the deficiency determination is on the taxpayer. We therefore sustain respondent's determination as to the disallowance of $4,464.62 and $110.15 claimed as a deduction by McLellan as premiums *368 paid on credit life insurance. The major issue in this case is whether Bernard is liable as a transferee for the unpaid income tax deficiency and addition to tax of the McLellans. Section 6901(a)(1)(A)(i) authorizes assessment of transferee liability at law or in equity, in the same manner as assessment of income taxes. [2] The burden of proving that a person is liable as a transferee of another taxpayer is on respondent and, since the only transferee liability that exists is that imposed by state law, it is incumbent on respondent to show that such a liability exists under the state law, here that of Mississippi. Commissioner v. Stern,357 U.S. 39, 45 (1958). *369 The law of Mississippi[3] provides that every conveyance made of malice, fraud, covin, collusion, or guile for the purpose to delay, hinder or defraud creditors shall be void and conveyances not for valuable consideration shall be taken as fraudulent unless in writing and recorded. The Mississippi statute further provides that these provisions shall not apply to creditors whose debts were contracted after the fraudulent act "unless made with intent to defraud them." *370 Respondent contends that he has shown in this case the existence of essentially all the traditional badges of fraud of creditors enumerated in the leading case of Blount v. Blount,231 Miss. 398, 95 So. 2d 545 (1957). He argues that since he has shown actual as opposed to constructive fraud, that he need not prove the transferor's insolvency. He further asserts that Bernard was particeps criminis in the attempt to defraud his father's creditors, so he is not, under Mississippi law, entitled to reimbursement for consideration he paid or a credit for his repayments of the money. Blount v. Blount,supra.Mississippi Cottonseed Products Co. v. Phelps,196 Miss. 252, 16 So. 2d 854 (1944). Respondent, in relying on the Blount case, contends that the Government was an existing, and not a subsequent creditor of McLellan, so as to fall under section 265 rather than section 267 of Miss. Code (1942). Respondent argues that since the Government was an existing creditor at the time of the transfer, proof of a general fraudulent intent existing at the time of the transfer as to all existing creditors raises a presumption *371 of a fraudulent intent as to the Government, but argues that if the Government is considered a subsequent creditor, the evidence shows McLellan's actual intent to defraud the Government on January 20 and February 1, 1966, by making the transfers. Miss. Code Ann., section 267 (1942). Blount v. Blount,supra.
We need not decide whether the Government was an existing creditor, since we agree with respondent that the evidence shows McLellan's intent to defraud the Government by the transfers under Miss. Code Ann., section 267 (1942). All the basic elements of fraud normally relied upon are here present. McLellan, being heavily indebted, made a voluntary transfer of all his property to his son for no legitimate business or personal reason. He transferred his personal residence to Bernard, who had no use for the property with the understanding, which was carried out, that his parents would retain possession. McLellan testified at the trial that he transferred money from the proprietorship bank account to prevent creditors who held liens on his machinery from sending drafts through the bank. McLellan was, of course, aware that he had almost entirely wiped out his *372 tax liability for the prior 4 years by use of investment credits which would be recaptured if his machinery were repossessed. In our view the evidence here clearly shows that McLellan intended to place his property beyond the reach not only of existing creditors but also of the Government if the Government were not an existing creditor. Transfers in anticipation of debts and with the intent to avoid such debts are fraudulent and void under Mississippi law. Blount v. Blount,supra; Allred v. Nesmith,245 Miss. 376, 149 So. 2d 29 (1963). McLellan was well aware of his precarious financial position at the end of 1965. He testified that he had been receiving threatening letters from his equipment creditors during the winter months. Under his best hopes he would probably not receive any money from his contracts until the spring of 1966. It follows that he must have anticipated that the creditors who held liens on his equipment would repossess that equipment. It was in order to have the $50,000 not only "to pay debts" but to "live off of" that caused him to "put" that money "in his son's name." McLellan testified that he put the real property *373 "in his sons's name" so he could borrow on it to complete jobs in the spring. This is tantamount to saying that the property was to be kept out of reach of creditors so he could resume business with the money in the spring. According to McLellan, it was only because of the Moon & Sons' letter which resulted in the bonding company's taking over his contracts that he was kept from going through with the plan. Certainly, McLellan knew in January 1966 that if he did not pay the monthly payments due on his heavy equipment that his creditors would repossess that equipment and that the substantial investment credits he had taken in previous years would be recaptured. In our view McLellan's transfer of property to his son was to keep it from the reach of the Government as well as other creditors. McLellan testified that he thought if he could get funds to start up in the spring he could redeem his heavy equipment in effect admitting that he recognized the fact that if he did not make his monthly payments that equipment would be repossessed. Respondent made a strong case of McLellan's fraudulent intent as to his debt to the Government. It thereby becomes incumbent upon petitioners to rebut *374 this evidence, Mississippi Cottonseed Products Co. v. Phelps,supra. Petitioners have totally failed to rebut this evidence. Petitioners admit that the $50,000 was transferred to Bernard totally without consideration. In fact, both McLellan and Bernard referred to this money as being "put in Bernard's name" so that McLellan could keep control over it from his creditors. Petitioners make some argument that there was consideration for the transfer to Bernard of the land. Both McLellan and Bernard referred to the $10,000 "loaned" by Bernard to McLellan in 1959 or 1960 with the idea that McLellan would buy some land for Bernard with this money. McLellan testified that some of the 132 acres transferred to Bernard in January 1966 was land he bought in 1964 with some of the $10,000. The $10,000 supposedly was part of $39,000 given by Bernard's grandfather to Bernard but held "in escrow" in a safe in his uncle's store. The uncle died shortly before the trial of this case. Neither McLellan nor Bernard could explain why or how Bernard got the $10,000 in 1959 or 1960 at age 17 or 18 to "loan" to his father or what became of the other $29,000. We do not consider the *375 testimony that part of the land was bought with $10,000 which was Bernard's money credible and therefore do not accept it. The balance of the "consideration" was, according to petitioners, to be paid by Bernard to McLellan later as he sold or borrowed on the land. In our view the transfer of the land was not a bona fide transfer for a valuable consideration. There was no stated consideration for the transfer. The substance of the transaction was an arrangement whereby Bernard was to supply his father with additional funds through borrowing on the land, while allowing his parents to continue to reside in their home and keeping the property out of the reach of creditors. There was no intent to transfer the ownership or use of the property. Even were we to recognize the moneys which we have found Bernard paid to his father in later years when some of the property was sold or mortgaged as valuable consideration for the property, a conveyance may nonetheless be invalid if made without good faith and with a fraudulent intent. Blount v. Blount,supra. The facts are that the transfer was made for inadequate consideration when McLellan was heavily indebted, that Bernard *376 had no use for the property, and that the transferors retained possession of the land; these are all well recognized badges of fraud. Firestone Tire and Rubber Company v. Hooker,215 F. Supp. 482, 485 (N.D. Miss., W.D., 1963). Based upon these facts, we find that the conveyance of the land as well as the $50,000 cash was intended by McLellan to defraud his creditors. The conveyances are accordingly void under Mississippi law as to McLellan's creditors, including the Government since McLellan could reasonably foresee his tax liability at the time of the transfers. Having held that the transfer of the $50,000 and the land were fraudulently made by McLellan to defraud his creditors, it is necessary to decide whether Bernard is entitled to offset his liability by the amounts of the $50,000 and proceeds he received from the real estate which he returned to his father. As petitioners point out, in numerous cases we have recognized that if a transferee reconveys the property to the transferor prior to any action by respondent to collect from the transferee, the transferee relieves himself of liability. In Robert Ginsberg,35 T.C. 1148, 1155-56 (1961), *377 aff'd. 305 F.2d 664 (C.A. 2, 1962), we stated: We have recognized that if a transferee reconveys the property to the transferor prior to the respondent's taking action to collect from the transferee, the transferee relieves himself of any liability, since the retransfer purges the graud from the original transfer, the return of the property serving to leave the creditor in the same position he was in prior to the original transfer. Fada Gobins,18 T.C. 1159, affirmed per curiam, 217 F.2d 952 (C.A. 9). However, in Louise Noell,24 T.C. 329, appeal dismissed 234 F.2d 665 (C.A. 8), we held that where the reconveyance occurred after the issuance of the notice of transferee liability, the transferee is not relieved of liability. In that case we relied upon the general rule as stated in Glenn, Fraudulent Conveyances and Preferences (rev. ed.), sec. 57, that, "if a transferee should surrender the property to the debtor, together with its interim earnings, prior to institution of an attack by creditors, he will be relieved of all liability. [Emphasis supplied]," and as stated in Wait on Fraudulent Conveyances *378 and Creditors' Bills (3d ed.) sec. 176, that "If the party has accounted to the debtor for the proceeds of the property before proceedings are taken against him by the creditor, he cannot be forced to account for it over again. [Emphasis supplied.]" We concluded that the inference is inescapable that a retransfer after an attack has no such effect. Accordingly, we there concluded that the correct rule is that once the transferee has been given proper notice that the creditors of the transferor are holding the transferee liable, he makes further transfers at his peril. In the Noell case the taxpayer resided in Missouri, and it appeared that the general rule was applicable in that State. From an examination of the cases cited by the parties, and other New York cases, it is our conclusion that the general rule is applicable in New York. We have found no New York State case which would indicate that a recoveyance, after the institution of a creditor's suit, would serve to relieve the transferee of liability. See Cramer v. Blood,57 Barb. 155, affd. 48 N.Y. 684, and Wilds v. Williston,128 Misc. 654, 219 N.Y.S. 676, which *379 are cited in Glenn, Fraudulent Conveyances and Preferences (rev. ed.), sec. 57, in support of the quoted statement of the general rule. However, as is noted from the above quotation, whether a reconveyance to the transferor prior to notice from respondent of his liability as a transferee relieves the transferee of liability is a matter of State law. See United States v. Brand,346 F. Supp. 279 (N.D. Ohio, 1972). Respondent takes the position that under Mississippi law the transferee is not relieved of liability by a retransfer to the transferor prior to notice of the intent of respondent to collect from him as a transferee, if the transferee himself is a participant in the fraud. Respondent relies again on Blount v. Blount,supra, which states the rule in Mississippi as follows (95 So. 2d at 560): when a conveyance is fraudulently made upon a consideration, which is valuable, but substantially inadequate, and the grantee is without notice of the grantor's intent, and himself intends no fraud, the conveyance is not wholly void, but will be allowed to stand as security for the value actually paid. However, it is only in *380 cases where the grantee in a fraudulent conveyance or transfer is not guilty of actual fraud, but is chargeable with knowledge of such facts that the law holds him guilty of constructive fraud, that the grantee is entitled to protection to the extent of the consideration paid by him, or that the court may allow the conveyance to stand as security for the reimbursement of the grantee. In this case the finding of the chancellor was a finding of actual fraud on the part of the grantee as well as the grantor. Where the conveyance is founded in actual fraud the grantee is regarded as a particeps criminis, and is not entitled to reimbursement, or to have the conveyance stand for any purpose of reimbursement or indemnity, for the consideration paid. 37 C.J.S. Fraudulent Conveyances, section 280 b, p. 1118. While Bernard was certainly aware that he was holding money for his father, in our view the evidence is not sufficient to show that he actually participated in the fraudulent intent toward his father's creditors. He testified that he thought he was helping his father merely to better control his finances, and that his father intended to use the money to pay something on account to each *381 of his creditors, hoping thereby to keep his debts under control until he started up work in the spring. Bernard did not return to Vaiden until December 1965 and although he hoped to participate in his father's business, he could not have begun until spring since there was no construction going on during the winter months. These and other facts in the record lead us to conclude that Bernard did not participate knowingly in his father's fraud. We therefore deem his liability offset by amounts retransferred to McLellan. As proof of amounts retransferred to his father, petitioner introduced $4,028.34 worth of checks paid to several of his father's creditors, and $19,000 in checks made out to McLellan or to the proprietorship. These checks total $23,028.34. There is a February 18, 1966, check for $25,000 made out to cash which respondent argues has not been shown to represent amounts returned by Bernard to his father, and $1,971.66 unaccounted for. In our view the evidence as a whole supports petitioners' contention that the funds received from this check were returned by Bernard to his father. The evidence shows that Bernard's general intention was simply to hold the money until his *382 father needed it. The evidence as a whole supports the petitioners' position as to the return of the $25,000. There is no evidence in the record as to the remaining $1,971.66. Since Bernard was not working during the first 6 months of 1966, it might well be he used this sum. In any event, since respondent showed a fraudulent transfer to Bernard, petitioner must go forward with the evidence necessary to show a return of the funds transferred. This he has not done as to the $1,971.66. We also find that Bernard is entitled to credits for retransfers to his father of $26,034.97, representing proceeds of sales, insurance coverage, and a mortgage on the real property transferred. Accordingly, he is liable as a transferee to the extent the $39,800 value of the land exceeds the $26,034.97 returned to his father, which is $13,765.03 plus the $1,971.66 cash unaccounted for. This makes a total of $15,736.69 plus interest as provided by law for which Bernard is liable as transferee. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, unless otherwise noted.↩
1. A corresponding deposit is reflected in the McLellan & Randle account, except that for a check dated August 19 for $1,000, only $500 is shown as deposited on August 20 in the company account.↩
2. SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate, and gift taxes.-- (A) Transferees.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * * * *↩
3. Mississippi Code Ann. (1942): § 265. Fraudulent conveyances. Every gift, grant, or conveyance of lands, tenements, or hereditaments, goods or chattels, or of any rent, common or other profit or charge out of the same, by writing or otherwise; and every bond, suit, judgment, or execution had or made and contrived suit, judgment, or execution had or made and contrived of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, or forfeitures, or to defraud or deceive those who shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or commodity out of them, shall be from henceforth deemed and taken only as against the person or persons, his, her, or their heirs, successors, executors, administrators, or assigns, and every of them whose debts, suits, demands, estates, or interests by such guileful and covinous devices and practices shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding. And moreover, if any conveyance be of goods or chattels, and be not on consideration deemed valuable in law, it shall be taken to be fraudulent within this statute, unless the same be by will duly proved and recorded, or by writing acknowledged or proved; and such writing, if the same be for real estate, shall be acknowledged or proved and filed for record in the county where the land conveyed is situated, and, if for personal property, then in the county where the donee shall reside or the property shall be; and the proof or acknowledgment in either case shall be taken or made and certified in the same manner as conveyances of lands and tenements are by law directed to be acknowledged or proved, unless, in the case of personal property, possession shall really and bona fide remain with the donee. § 267. When void as to subsequent creditors. The last two sections shall not extend to any estate or interest in any lands, goods or chattels, or any rents, common, or profit out of the same, which shall be upon good consideration and bona fide lawfully conveyed or assured to any person or persons, bodies-politic or corporate; nor shall it in any case extend to creditors whose debts were contracted after such fraudulent act, unless made with intent to defraud them; and though a conveyance or contract be decreed void as to prior creditors, it shall not, on that account, be void as to subsequent creditors or purchasers.↩