SHIRLEY T. HAGAMAN, TRANSFEREE FOR WILLIAM S.
HAGAMAN, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 3239–90.                    Filed March 15, 1993.

*James P. Anderson, Jr.,* for petitioner.
*Rebecca A. Dance* and *Robert B. Nadler,* for respondent.

HALPERN, *Judge:* By order of dismissal and decision
entered February 18, 1993, in docket No. 747-85, this Court
ordered and decided that there are deficiencies in and addi-
tions to William S. Hagaman's (Hagaman or the taxpayer)
Federal income taxes as follows:

| Year | Deficiency | Addition to tax sec. 6653(b) |
|------|-----------|------------------------------|
| 1975 | $184,453 | $92,226.50 |
| 1976 | 177,449 | 88,724.50 |
| 1977 | 64,800 | 31,063.00 |
| 1978 | 140,937 | 70,468.50 |

Those amounts remain unpaid. The sole issue for decision is
whether petitioner is liable as a transferee of Hagaman for
$263,000 (the amount transferred) plus interest thereon.[1]

---

[1] A transferee's liability generally is limited to the value of the assets received from the trans-
feror. *Gumm v. Commissioner,* 93 T.C. 475, 480 (1989), affd. without published opinion 933 F.2d
1014 (9th Cir. 1991). That amount is $263,000, the value of furniture, jewelry, furs, a residence,
cash, and stock allegedly transferred to petitioner. The parties appear to have assumed that,
if there is transferee liability under State law, then petitioner is also liable for applicable inter-
est. We accept that without so deciding.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Petitioner resided in Fort Lauderdale, Florida, at the time the petition was filed. Petitioner and Hagaman were not married during the taxable years here at issue.

In 1976 or 1977, Hagaman began a relationship with petitioner. At that time Hagaman was married to his first wife, Bonnie Hagaman (Bonnie). Approximately a year and a half later, petitioner and Hagaman moved in together; they were married on August 1, 1987. During Hagaman's and petitioner's relationship, Hagaman gratuitously conveyed several items to petitioner. In 1979, Hagaman gave petitioner a 2.09-carat diamond engagement ring having a fair market value of $3,000 at that time. In approximately 1982, Hagaman gave petitioner two fur coats having a fair market value of $5,000 at that time, as Christmas presents. In the early 1980s, Hagaman also gave petitioner stock in several automobile companies, having a value of $22,000 at that time. Hagaman also gave petitioner cash totaling $80,000 on several occasions during the period beginning June 1984 and ending March 1986. In September 1984, Hagaman purchased a house in Broward County, Florida. The property had a fair market value at the time of $150,000. On November 23, 1984, Hagaman gave that house to petitioner. In May 1985, Hagaman purchased furniture having a value of $3,000 for petitioner's Florida house. Hagaman received no consideration for any of the above transfers.

On October 10, 1984, respondent issued a statutory notice of deficiency to Hagaman and Bonnie for the years 1975-78, determining deficiencies and additions to tax for fraud pursuant to section 6653(b). Hagaman and Bonnie contested those deficiencies and additions to tax before this Court. On October 27, 1987, this Court filed its opinion, captioned *Hagaman v. Commissioner,* T.C. Memo. 1987-549, affd. in part and

remanded in part 958 F.2d 684 (6th Cir. 1992), largely sustaining respondent's determinations and finding Hagaman liable for additions to tax for fraud pursuant to section 6653(b) for all the years at issue.[2] Hagaman and Bonnie were divorced in June or July 1987. Hagaman married petitioner on August 1, 1987. On September 1, 1987, Hagaman and petitioner entered into a "Postnuptial Agreement", listing the estimated values of their respective assets and setting forth their agreement that their respective assets would be held separate and apart from those of the other, except to the extent that any assets might be placed in their joint names.

On May 20, 1989, petitioner and Hagaman entered into an "Exchange Agreement" wherein petitioner conveyed to Hagaman an interest as tenant by the entirety in the Florida residence, in exchange for the conveyance by Hagaman to petitioner of an interest as tenant by the entirety in a parcel of real property in Tennessee (the Tennessee property). The exchange agreement describes the two properties as having approximately equal value. On October 12, 1989, the Internal Revenue Service (IRS) made jeopardy assessments against Hagaman and petitioner. Thereafter, the transferee jeopardy assessment against petitioner was abated.

A few weeks after petitioner and Hagaman signed the above-mentioned exchange agreement, the two began having marital difficulties. Petitioner and Hagaman entered into a "Marital Separation and Property Settlement Agreement" (property settlement agreement), dated September 22, 1989, and approved by the Circuit Court of Hamilton County, Tennessee, on January 18, 1990. Among other things, the property settlement agreement provides that Hagaman will reconvey to petitioner his interest in the Florida residence and that petitioner will reconvey to Hagaman her interest in the Tennessee property.

---

[2] The Court of Appeals for the Sixth Circuit remanded that case for a determination of whether all the funds that Hagaman diverted from his corporation were covered by earnings and profits so as to render them taxable to him as ordinary income. In all other respects the Court of Appeals affirmed this Court's decision. On remand, by order of dismissal and decision entered Feb. 18, 1993, in docket No. 747-85, we ordered and decided Hagaman to be liable for deficiencies and additions to tax as set forth above.

OPINION

## I. *Background*

Section 6901(a) provides that the liability of a transferee of property "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred". The burden of proof as to such transferee liability is on respondent. Sec. 6902(a); Rule 142(d). We emphasize, however, that section 6901(a) imposes no transferee liability, but merely provides a procedure through which respondent may collect from a transferee of assets unpaid taxes owed by the transferor of the assets if a basis exists under applicable State law or equity for holding the transferee liable. *Commissioner v. Stern,* 357 U.S. 39, 42-47 (1958); *Gumm v. Commissioner,* 93 T.C. 475, 479 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991).

## II. *Elements of Transferee Liability*

We have held that, in order to prevail under section 6901(a), respondent must show:

(1) That the alleged transferee received property of the transferor; (2) that the transfer was made without consideration or for less than adequate consideration; (3) that the transfer was made during or after the period for which the tax liability of the transferor accrued; (4) that the transferor was insolvent prior to or because of the transfer of property or that the transfer of property was one of a series of distributions of property that resulted in the insolvency of the transferor; (5) that all reasonable efforts to collect from the transferor were made and that further collection efforts would be futile; and (6) the value of the transferred property (which determines the limit of the transferee's liability). [*Gumm v. Commissioner, supra* at 480; citations omitted.]

Professors Bittker and Lokken have stated that "This distillation of what is sometimes called the trust fund theory is a useful guide, but, to the extent it implies there is a common body of national law protecting the rights of creditors, it must yield to the Supreme Court's admonition in *Stern* that 'the existence and extent of [transferee] liability should be determined by state law.'" 4 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 111.6.7, at 111-188 (2d ed. 1992) (quoting *Commissioner v. Stern, supra* at

45) (fn. ref. omitted). We agree with Professors Bittker and Lokken. We would therefore emphasize that *Gumm's* distillation of the trust fund theory is viable only as a *generalization* of typical State law; section 6901 does not itself impose those requirements.[3] We would further caution that *Gumm's* distillation of the trust fund theory, which theory pertains to transferee liability *in equity,* is not a useful guide regarding transferee liability *at law* (e.g., under a corporate merger statute or bulk sales law), whose elements typically are quite different. See generally Saltzman, IRS Practice and Procedure, pars. 17.01[4], 17.03, 17.04 (2d ed. 1991).

Moreover, even with regard to transferee liability in equity, certain of the elements described in *Gumm* frequently are unnecessary under State law. Typically, the elements of transferee liability in equity in a given State will be embodied in that State's fraudulent conveyances law. Saltzman, *supra* par. 17.04[1]. One common fraudulent conveyances law is the Uniform Fraudulent Conveyances Act (UFCA), 7A U.L.A. 427 (1985). The most commonly used provisions of UFCA permit a creditor to prevail by demonstrating either constructive or actual fraud. *Id.* Under UFCA section 4, 7A U.L.A. 474 (1985), every conveyance made (1) without fair consideration (2) by a person who is or will thereby be rendered insolvent constitutes a fraudulent conveyance (constructive fraud). Under UFCA section 7, 7A U.L.A. 509 (1985), every conveyance made with the actual intent to defraud creditors is fraudulent, even if the transferor is not and will not be rendered insolvent by such transfer. Under UFCA section 7, 7A U.L.A. 509 (1985), therefore, the focus is on the transferor's intent and not the adequacy of the consideration or the financial condition of the transferor. *Id.* Accordingly, we note that the second and fourth *Gumm* elements—regarding the adequacy of the consideration and the insolvency of the transferor—often are unnecessary because respondent will be permitted to prove a fraudulent transfer by demonstrating actual intent to defraud. More generally, we would emphasize yet again our agreement with Professors Bittker and Lokken that the generalizations outlined both in *Gumm* and herein "must yield

---

[3] "Indeed, it is possible, though unlikely, that a particular state might dispense entirely with one or more of the traditional prerequisites." 4 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 111.6.7, at 111-189 (2d ed. 1992).

to the Supreme Court's admonition in *Stern* that 'the existence and extent of [transferee] liability should be determined by state law.'" 4 Bittker & Lokken, *supra* par. 111.6.7, at 111-188 (quoting *Commissioner v. Stern, supra* at 45).

Still, it is useful in this case, which deals with transferee liability in equity, to consider whether each of the traditional State law elements of transferee liability in equity has been satisfied. We consider each element in turn.

### A. *The Transfer*

The above-found facts establish that petitioner received property from Hagaman.

### B. *Inadequate Consideration*

The above-found facts establish that Hagaman transferred the property at issue to petitioner for no consideration.

### C. *Tax Liability Accrued at Times of Transfers*

Several courts have stated that tax liabilities, though unassessed, are obligations deemed due and owing at the close of the taxable year. *Edelson v. Commissioner,* 829 F.2d 828, 833-834 (9th Cir. 1987), affg. T.C. Memo. 1986-223; *Updike v. United States,* 8 F.2d 913 (8th Cir. 1925); *In re Ad-Yu Electronics, Inc.,* 71-1 USTC par. 9132 (D.N.J. 1968). We accept that proposition. Hagaman's tax liability therefore began accruing at the close of the 1975 calendar year, with increases in that liability occurring at the close of each other taxable year for which deficiencies have been sustained by this Court. Inasmuch as the transfers at issue commenced in 1979, it is clear that each transfer was made during or after the period for which the tax liability accrued (1975-78).

### D. *Insolvency of the Transferor*

We cannot conclude that Hagaman was insolvent either prior to or as a result of the series of transfers at issue. Respondent offers no evidence of Hagaman's insolvency, but merely argues that petitioner's testimony is insufficient to demonstrate that Hagaman was solvent at the time of, and immediately after, the transfers at issue. Petitioner's failure of proof, however, does not constitute an affirmative showing by respondent.

### E. *Reasonable Efforts to Collect From Transferor*

At trial, Revenue Officer H.L. Pace, who works for the IRS, Collection Division, testified that as of the trial date, October 29, 1991, Hagaman's liability was $3,048,724.14, including interest and penalties, and taking into account $180,000 that the IRS had already received. He further testified that he had attempted to collect from any other assets Hagaman might have and was unsuccessful. He testified that his efforts to locate assets included serving notices of levy to all banks in the Chattanooga, Tennessee, and Fort Lauderdale, Florida, areas, and also stock brokerage firms. He testified that he was unable to locate any bank accounts in the Chattanooga, Tennessee, area and obtained, for the IRS, $376.71 from those levies. He testified that collection efforts against Hagaman are futile.

We find Agent H.L. Pace's testimony credible and conclude that his efforts to uncover assets Hagaman might have are sufficient to support his conclusion that further collection efforts against Hagaman would be futile. We agree with that conclusion.

### F. *Value of the Transferred Property*

The above-found facts establish the value of the transferred property to be $263,000.

### G. *Conclusion*

Respondent has failed to show that the transferor was insolvent at the time of, or immediately after, the transfers at issue. It is therefore clear that respondent has failed to satisfy all the traditional prerequisites outlined in *Gumm v. Commissioner,* 93 T.C. 475 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991). That, however, is not fatal to respondent, since we find that, under applicable State law, no showing of insolvency is required, nor is such showing required by section 6901.

### III. *Choice of State Law*

Before applying State law, we must determine *which* State's laws are applicable to the transfers at issue. The parties agree that Florida law is applicable to the transfers of (1) real property located in Broward County, Florida, and (2)

the furnishings for that property. We therefore accept Florida law as applicable to those transfers.

The parties do not, however, agree on the State law applicable to the remaining transfers. Respondent argues that the remaining transfers took place in Tennessee and that Tennessee law therefore applies, premising that argument upon the proposition that the applicable law is that of the State where the transfer occurred. See *Fibel v. Commissioner,* 44 T.C. 647, 657 (1965); *Estate of Miller v. Commissioner,* 42 T.C. 593, 598-599 (1964); *LeBeau v. Commissioner,* T.C. Memo. 1992-359; *Hicks v. Commissioner,* T.C. Memo. 1970-267, affd. 73-2 USTC par. 9526 (9th Cir. 1973); *Day v. Commissioner,* T.C. Memo. 1965-326. Petitioner cites none of those cases but, apparently assuming the same rule as respondent, argues that the remaining transfers occurred in Florida and that Florida law therefore applies.[4]

We need not resolve that issue, however, because we find the result is the same under either Florida or Tennessee law. Under either law, respondent has proved the transfers at issue to be fraudulent.

IV. *Application of State Law*

A. *Tennessee Law*

Tenn. Code Ann. section 66-3-101 (1982) provides that any conveyance made with the "intent or purpose to delay, hinder, or defraud creditors" is avoidable. Tennessee case law provides that such conveyance "must be made without a fair consideration leaving the * * * [transferor] insolvent or it must be made with actual intent to hinder, delay, or defraud creditors." *Macon Bank & Trust Co. v. Holland,* 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986).

Actual intent can be proved by circumstantial evidence. Under Tennessee law: "As to existing creditors, a voluntary conveyance is presumed fraudulent and is avoidable" unless it is proven that the transferor's "financial condition was

---

[4] Despite the authorities adduced by respondent, and the parties' apparent agreement on the point, we explicitly decline to consider whether the applicable State law *invariably* must be that of the State where the transfers took place. It may be sufficient if the Commissioner can demonstrate that she would prevail against the transferee in *any* State court (or in a Federal court proceeding) under whatever State's law that forum court would apply. Nonetheless, we will consider the law of the transfer States to be applicable in this case, because neither party has suggested an appropriate alternative.

such that the transfer did not have the effect of hindering or delaying creditors." *In re Turner,* 78 Bankr. 166, 169 (Bankr. E.D. Tenn. 1987); see also *Nelson v. Vanden,* 42 S.W. 5, 7 (Tenn. 1897) ("The rule in this state is well settled that, as against existing creditors, a voluntary settlement or conveyance will be presumed fraudulent.").

We think that presumption is here warranted and, unless rebutted, requires the conclusion that petitioner would be liable as a transferee under Tennessee law. First, it is clear that the transfers at issue were voluntary, inasmuch as petitioner has stipulated that there was no consideration for such transfers.[5] Second, as discussed above, the IRS was a creditor at the time of the transfers. "Regardless of when federal taxes are actually assessed, taxes are considered as due and owing, and constitute a liability, as of [the] date the tax return for the particular period is required to be filed." *United States v. Ressler,* 433 F. Supp. 459, 463 (S.D. Fla. 1977) (citing *United States v. Adams Bldg. Co.,* 531 F.2d 342, 343 n.2 (6th Cir. 1976)), affd. 576 F.2d 650 (5th Cir. 1978).

Petitioner therefore bears the burden of rebutting the presumption that the transfers at issue were fraudulent. We find that petitioner has failed to meet that burden and therefore would be considered liable as a transferee under Tennessee law.

## B. *Florida Law*

The Florida statute applicable during the period in which the transfers at issue took place was Fla. Stat. section 726.01.[6] Fla. Stat. section 726.01 provides that any conveyance made with the "intent to delay, hinder or defraud creditors" shall be void.

In Florida, existing creditors have the benefit of a presumption of fraudulent intent where the conveyance is voluntary and there is a close relationship between the transferor and the transferee.

---

[5] A voluntary transfer includes any transfer made "for no consideration or for love and affection, which is treated as no consideration because it has no value to creditors." *In re Turner,* 78 Bankr. 166, 169 (Bankr. E.D. Tenn. 1987).

[6] Fla. Stat. sec. 726.01 was repealed by Fla. Laws ch. 87-79, sec. 13, effective Jan. 1, 1988. It appears that the courts of Florida still apply Fla. Stat. sec. 726.01 to transfers that took place prior to Jan. 1, 1988. See *Perrott v. Frankie,* 605 So. 2d 118 (Fla. Dist. Ct. App. 1992); *Hurlbert v. Shackleton,* 560 So. 2d 1276, 1279 (Fla. Dist. Ct. App. 1990).

It is well settled in this state that a voluntary conveyance by one who is indebted is presumptively fraudulent, when attacked by a judgment creditor upon a debt existing at the time the alleged fraudulent conveyance was executed, and in such cases it is not necessary for the complainant to show that his debtor was actually insolvent at the time he executed the voluntary conveyance transferring an asset, which would otherwise be directly subject to the lien of the judgment rendered on the then existing debt. [*Weathersbee v. Dekle,* 145 So. 198, 199 (Fla. 1933); fn. ref. omitted.]

Accord *Bay View Estates Corp. v. Southerland,* 154 So. 894, 899 (Fla. 1934), overruled en banc on another issue *B.A. Lott, Inc. v. Padgett,* 14 So. 2d 667 (Fla. 1943); see also *Scott v. Dansby,* 334 So. 2d 331, 333 (Fla. Dist. Ct. App. 1976) ("Where the parties involved in the alleged fraudulent transfer have a close relationship, such relationship tends to establish a prima facie case"); *Money v. Powell,* 139 So. 2d 702, 703-704 (Fla. Dist. Ct. App. 1962) ("where the transferee in an alleged fraudulent transaction is a relative or close associate of the transferor, such tends to establish a prima facie case which must be met by evidence on the part of the defendant.").

We think the presumption is here warranted. As we determined above, the transfers at issue were made for no consideration and were therefore voluntary. Further, it is clear from the entire record that petitioner and Hagaman had a close relationship at the times of the transfers at issue.

Petitioner therefore bears the burden of rebutting the presumption that the transfers at issue were fraudulent. We find that petitioner has failed to meet that burden and therefore would be considered liable as a transferee under Florida law.

## C. *Conclusion*

Under either potentially applicable State law, respondent has shown petitioner is liable as a transferee, despite respondent's failure to prove insolvency. We therefore hold petitioner liable as a transferee under section 6901(a).

## V. *Retransfers From Petitioner to Hagaman*

The rule regarding retransfers is as follows:

if a transferee reconveys the property to the transferor prior to the respondent's taking action to collect from the transferee, the transferee relieves himself of any liability, since the retransfer purges the fraud from

the original transfer, the return of the property serving to leave the creditor in the same position he was in prior to the original transfer. * * * [*Ginsberg v. Commissioner,* 35 T.C. 1148, 1155-1156 (1961), affd. 305 F.2d 664 (2d Cir. 1962); citations omitted.]

Petitioner argues that (1) "There is also a good deal of testimony to show that after the parties' marriage the cash and stock [transferred by Hagaman to petitioner] were used and consumed by [Hagaman], so that the net effect was the same as if the transfer never had been made", and (2) certain property was retransferred to Hagaman pursuant to (a) the exchange agreement, and (b) the property settlement agreement. We consider those arguments in turn.

With respect to petitioner's first argument, we observe that there is no evidence corroborating petitioner's assertion that certain cash and stocks were consumed by Hagaman. Because we are not persuaded by petitioner's uncorroborated testimony, we conclude that petitioner has not shown any funds to have been expended as she claims. Rule 142(a). Moreover, such expenditures, even if proven, would not be a defense.

Our decision in *Fada Gobins* [*v. Commissioner,* 18 T.C. 1159 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954)], *supra,* makes it clear that once funds are transferred in fraud of creditors, it is no defense to the transferee that part or all of those funds were subsequently expended for the living expenses of the transferor in the absence of a showing that the expenditures made had priority over the indebtedness to the Government. * * * [*Noell v. Commissioner,* 22 T.C. 1035, 1043 (1954).]

We also find petitioner's second argument unpersuasive, for two reasons. First, the exchange agreement and property settlement agreement, collectively, fail to negate any of the transfers at issue. Pursuant to the exchange agreement, petitioner conveyed a tenancy by the entirety in the Florida residence to Hagaman, in return for a tenancy by the entirety in the Tennessee property; pursuant to the property settlement agreement, Hagaman reconveyed to petitioner his interest in the Florida residence and petitioner reconveyed to Hagaman her interest in the Tennessee property. Thus, after the property settlement agreement, petitioner was once again the sole owner of the Florida residence, just as she was after the transfer in November 1984. Accordingly, we are unable to find that, pursuant to the exchange and property settle-

ment agreements, there was any retransfer by petitioner to Hagaman.

Second, even if we were to consider only the exchange agreement, in which petitioner did retransfer a portion of the Florida residence (a tenancy by the entirety), that transfer would not reduce petitioner's liability as a transferee. The reasoning behind the rule regarding retransfers is that transferee liability is inappropriate where a retransfer returns the transferor and transferee to the *same relative economic positions* as prior to the fraudulent transfer. See *Ginsberg v. Commissioner, supra.* That was not accomplished by petitioner's retransfer of an interest in the Florida residence to Hagaman, pursuant to the exchange agreement, because Hagaman provided, and petitioner received, fair consideration (a tenancy by the entirety in the Tennessee property).[7] Hagaman's economic position was therefore unaffected by the retransfer at issue, as was petitioner's. The reasoning set forth in *Ginsberg v. Commissioner, supra* at 1155-1156, is therefore inapplicable and petitioner remains liable as a transferee under section 6901(a).

To reflect that petitioner is liable only to the extent of the assets transferred,

*Decision will be entered under Rule 155.*

---

[7] Recall that those two properties were of approximately equal value at that time.