T.C. Memo. 2005-23

UNITED STATES TAX COURT

CARRIE H. SUCHAR, TRANSFEREE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17336-02, 17337-02      Filed February 14, 2005.
              17338-02.

Edward DeFranceschi, David Klemm, and Jason Bell, for
petitioners.

Carina J. Campobasso and Louise R. Forbes, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  By notices dated August 6, 2002, respondent

determined that petitioners Carrie, Tracy, and Deborah Suchar

_____

    [1] Cases of the following petitioners are consolidated
herewith:  Deborah R. Suchar, Transferee, docket No. 17337-02;
and Tracy L. Suchar, a.k.a. Tracy L. Sommers, Transferee, docket
No. 17338-02.

were liable as transferees relating to their father Richard Suchar's (Richard) Federal income tax liabilities for the years 1995 ($23,278) and 1996 ($20,238), plus penalties and interest.

Based on respondent's determination as to the value of assets transferred by Richard to Carrie, Tracy, and Deborah, respondent determined that the amounts of the respective transferee liabilities of Carrie, Tracy, and Deborah relating to Richard's above Federal income tax liabilities, penalties, and interest, were as follows:[2]

| Carrie | Tracy | Deborah |
|--------|-------|---------|
| $51,394 | $25,000 | $25,000 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time they filed their petitions, Carrie resided in Maine, and Tracy and Deborah resided in California.

---

[2] To the extent the Court's conclusions herein as to the value of Richard's property that was transferred to petitioners are higher than the value therefor initially determined by respondent, respondent has pending a motion to increase petitioners' transferee liabilities accordingly.

By marriage between Richard and his first wife, Susan Suchar (Susan), there was born a son, John Suchar (John), and three daughters, petitioners herein -- Carrie, Tracy, and Deborah. Richard and Susan's marriage ended in divorce in 1982.

In April of 1985, Richard married Marilou Suchar (Marilou). That marriage ended in divorce on August 16, 1994, the year in which Richard retired from the Central Maine Power Company. By that marriage, no children were born.

In 1994, at the time of Richard's and Marilou's divorce, two parcels of real property located in China, Maine, that had been in Richard's family for a number of generations were owned by Richard and Marilou as tenants in common.

The first parcel consisted of 218 acres of land on which a number of farm buildings were located (farm acreage).

The second parcel, adjacent to the first parcel, consisted of a small home located on approximately 3.5 acres of land (residence acreage).

During all or a portion of Richard's first marriage, Richard and Susan apparently lived on the residence acreage with John, Carrie, Tracy, and Deborah.

Since her divorce from Richard in 1984, Susan has continued to live on a third parcel of real property located adjacent to the farm acreage and the residence acreage.

In the early 1990s, in an attempt to reconcile difficulties in his marriage with Marilou, Richard added Marilou's name on the deeds to the farm acreage and the residence acreage.

Apparently during Richard's 9-year marriage to Marilou, Richard and Marilou lived in the home on the residence acreage. After his divorce from Marilou in 1994, Richard lived alone on the residence acreage.

For purposes of the 1994 divorce proceedings between Richard and Marilou and the property division that occurred relating thereto, the farm acreage and the residence acreage were valued by a local realtor at a combined total fair market value of approximately $200,000.

In the August 16, 1994, divorce decree involving Richard and Marilou, based on the above realtor's valuation of the two parcels, the divorce court placed a total value on the farm acreage and the residence acreage of $200,000. After reduction for an outstanding $32,000 mortgage on the farm acreage, the divorce court concluded that the farm acreage and the residence acreage had a total net value to Richard's and Marilou's marital estate of $167,366.

Under the 1994 divorce decree, within one year of the divorce, Richard was given the right or the option to purchase Marilou's one-half interest in both the farm acreage and the residence acreage for $80,000, approximately the net value

determined by the divorce court for Marilou's one-half interest therein, which would leave Richard as sole owner of both the farm acreage and the residence acreage.

Under the divorce decree, in the event Richard did not exercise his right to purchase Marilou's interest in the farm acreage and the residence acreage, both parcels were to be sold in the local real estate market with the first $84,000 of the proceeds from any such sale to be paid to Marilou (less any amounts already paid by Richard to Marilou), and the balance of the proceeds was to be paid to Richard.

In the divorce proceeding between Richard and Marilou, Richard, who represented himself, argued against his own interest that the farm acreage and the residence acreage had a value significantly above the value placed thereon by the local realtor and by the divorce court.

Subsequent to 1994 and through 1998, real estate values in the vicinity of China, Maine, generally increased.

Richard made early withdrawals from his Individual Retirement Account (IRA) of $98,500 in 1995 and $70,500 in 1996, which cumulative $169,000 represented the total balance in his IRA which Richard had built up over the years while working for the Central Maine Power Company.

Richard used a portion of the IRA distributions to purchase tools and farm equipment and a prefabricated building installed

on the farm acreage, but Richard also lost $40,000 of the IRA distributions by investing the $40,000 in speculative commodity market transactions.

Between when he retired on August 16, 1994, and September of 1998, Richard occasionally was employed in construction work.

In 1997, due to Richard's failure to purchase Marilou's interest in the farm acreage and in the residence acreage, Marilou sought to have the divorce court cite Richard for contempt, to have Richard incarcerated, and to order the farm acreage and the residence acreage listed for sale.

In a legal document dated and filed with the divorce court on August 5, 1997, Richard's attorney represented that the only significant assets Richard owned were his interests in the farm acreage and in the residence acreage.

In August of 1997, Richard contacted a realtor about selling the farm acreage and the residence acreage. The realtor recommended subdividing just 54 of the 215 acres in the farm acreage into four residential lots and selling the four lots for a total of approximately $265,000.

By early 1998, under threats from Marilou that she would seek from the divorce court a contempt order and his incarceration, Richard was pressured to list the farm acreage and residence acreage for sale.

Based on Richard's agreement to list the parcels, the divorce court agreed not to incarcerate Richard. Thereafter, the farm acreage and the residence acreage were unsuccessfully listed for sale at a price not disclosed in the record.

By the spring of 1998, the farm acreage and the residence acreage had not sold, and Marilou had not received any portion of the $84,000 specified in the 1994 divorce decree relating to her interest in the farm acreage and the residence acreage. Richard was delinquent in obligations he owed under the divorce decree (e.g., mortgage payments and real estate taxes due on the farm acreage and on the residence acreage), and Marilou's name was still on the deeds.

John, who at the time was 24 years old, agreed to purchase from Richard and Marilou for approximately $45,000 their interests in the farm acreage. The $45,000 represented the payoff of the mortgage on the farm acreage, and the payment of overdue real estate taxes, plus a $30,000 cash payment to Marilou.

John's offer represented an attempt to keep the farm acreage in the Suchar family while at the same time providing funds that could be used to pay Marilou a portion of the value of her one-half ownership interests in the farm acreage and in the residence acreage.

Unfortunately, John was unable to obtain financing, and in April of 1998, John tragically died. John was buried on the separate parcel of real estate on which Susan lives adjacent to the farm acreage and the residence acreage.

At this point, in order to keep ownership of the farm acreage and the residence acreage in the Suchar family and also to provide funds to Marilou, Susan (Richard's first wife and the mother of Carrie, Tracy, and Deborah) offered to provide funds for the purchase from Richard and Marilou of the farm acreage for a total of approximately $45,000. Susan effectively took over John's earlier offer to purchase the farm acreage and thereby to provide the funds that were needed to pay off the mortgage and taxes and to pay Marilou a portion of the value of her interest in the farm acreage and the residence acreage.

In April of 1998, respondent's revenue officer contacted Richard to inquire regarding unpaid delinquencies in Richard's Federal income tax liabilities for 1993 and 1994 and regarding Richard's unfiled 1995 and 1996 Federal income tax returns.[3]

Respondent's revenue officer inspected the farm acreage and the residence acreage and met with Richard in the home located on the residence acreage. Respondent's revenue officer described

---

[3] In the course of an earlier audit of Richard regarding Richard's failure to file Federal income tax returns for 1993 and 1994, respondent had prepared Federal income tax returns for Richard for those years.

the condition of the residence acreage as of April of 1998, as follows: "A ranch home reflecting some deferred maintenance, frankly, a barn, some farm equipment scattered around the barn."

Pursuant to the above offer of Susan to provide $45,000 for the purchase of the farm acreage, on July 13, 1998, a written purchase and sale agreement relating to the farm acreage was prepared showing Richard and Marilou as the sellers, and Carrie, Tracy, and Deborah, as the purchasers. Susan's name does not appear on this document, and the only signature that appears on this document is Richard's. The signature line for Marilou is blank. On the signature line for Carrie, Tracy, and Deborah, as buyers, Carrie's, Tracy's and Deborah's names are printed. In July and August of 1998, Tracy and Deborah were not aware of this document, and in July of 1998 no payment was made under this document.

On August 17, 1998, Richard untimely filed his 1995 Federal income tax return on which he reflected a total Federal income tax liability of $28,336. No payment was submitted by Richard to respondent with the filing of this tax return.

On September 9, 1998, generally consistent with the terms of the above July 13, 1998, purchase and sale agreement relating to the farm acreage, Richard and Marilou executed a warranty deed transferring all of the farm acreage to Carrie, Tracy, and Deborah, as tenants in common, with the exception of 20 acres

that were carved out and retained by Richard and Marilou. Hereinafter, references to the "farm acreage" refer to such parcel of real property without the 20-acre carve out (i.e., to the remaining 198 acres).

Susan provided the $45,892 in cash, representing the total stated consideration due on this transfer to Carrie, Tracy, and Deborah of Richard's and of Marilou's interests in the farm acreage.

Of the total $45,892 provided by Susan in connection with this transfer of ownership of the farm acreage, $12,589 was used to pay off the existing mortgage and $3,303 was used to pay off overdue real estate taxes, for both of which Richard was solely liable under the 1994 divorce decree, and the remaining $30,000 in cash was paid to Marilou.

Thus, of the total $45,892 provided by Susan, $30,000 was paid directly to Marilou, and $15,892 accrued to Richard's benefit by virtue of its use to pay off the mortgage and real estate taxes Richard owed under the divorce decree.

Also on September 9, 1998, Richard executed a quitclaim deed transferring to Carrie his interests in the residence acreage and in the 20-acre carve out (hereinafter, references to the "residence acreage" generally refer to the residence acreage along with the 20-acre carve out). Marilou was a signatory and transferor on the September 9, 1998, quitclaim deed relating to

the residence acreage, but she also was shown as a transferee on the quitclaim deed, along with Carrie, with both Marilou and Carrie thereafter owning the residence acreage as tenants in common. Thus, by this quitclaim deed Marilou effectively transferred her interest in the residence acreage to herself, and Richard transferred his one-half interest therein to Carrie.

In connection with his transfer to Carrie of his interest in the residence acreage, no consideration was received by Richard. Susan did not participate in this transfer affecting the residence acreage, and none of the $45,892 in funds Susan provided in connection with the transfer of the farm acreage related to the transfer involving the residence acreage.[4]

---

[4] Two months earlier, on July 17, 1998, without Susan's, Carrie's, Tracy's, and Deborah's knowledge, Richard had executed two quitclaim deeds purporting to transfer to Carrie, Tracy, and Deborah his one-half interest in the farm acreage and to Carrie his one-half interest in the residence acreage. Although these two quitclaim deeds were recorded with the Kennebec County, Maine, Registry of Deeds, no consideration was paid to Richard for these quitclaim deeds, and copies of the quitclaim deeds were not delivered by Richard to Carrie, Tracy, and Deborah. On these facts, the quitclaim deeds apparently would not have been effective under Maine law either to transfer Richard's ownership interest in the farm acreage to Carrie, Tracy, and Deborah or to transfer Richard's interest in the residence acreage to Carrie.

Respondent asserts that the transferee liability of Carrie, Tracy, and Deborah at issue herein arises under either Richard's July quitclaim deeds or under the September deeds. We consider Carrie, Tracy, and Deborah's transferee liability only under the September deeds, and hereinafter we generally disregard Richard's July quitclaim deeds.

Prior to the above September 9, 1998, transfers to his daughters, Richard's ownership interests in the farm acreage and in the residence acreage constituted substantially all of Richard's assets.

On September 9, 1998, Richard's attorney sent a fax to Marilou's attorney explaining that the deed and the transfer of the residence acreage occurred "for the purpose of getting the land out of Richard's name" and that "He has good reasons and this will provide protection for Marilou's interest."

Also, on September 9, 1998, Richard's attorney told Marilou that Richard needed to get the parcels out of Richard's name because Richard was in trouble with "the IRS".

In a letter dated September 11, 1998, Richard's attorney explained that Richard had executed the ineffective July 20, 1998, quitclaim deeds, see supra note 4, "primarily to protect the title to and alienability of the property", that, if Carrie, Tracy, and Deborah were to deed the farm acreage and the residence acreage back to Richard, "the consequence * * * would be to give another tenacious creditor control over the property," and that "Richard's intentions may have been antagonistic to that other creditor, but they were not vis-a-vis Marilou".

During 1998, Tracy and Deborah lived in California, and they apparently were not aware of the various deeds and transfers that

occurred involving the farm acreage and the residence acreage, nor what consideration was associated therewith.

On September 28, 1998, Richard untimely filed his 1996 Federal income tax return, on which was reflected a total Federal income tax liability of $20,238. With this tax return, no payment was submitted by Richard to respondent.

Almost all of the income reflected on Richard's 1995 and 1996 Federal income tax returns was attributable to the taxable distributions from Richard's IRA account ($98,500 in 1995 and $70,500 in 1996).

On September 28, 1998, Richard prepared and signed and gave to respondent's revenue officer a financial statement, Form 433-A, Collection Information Statement for Individuals, relating to Richard's financial assets, on which it was indicated that Richard was employed part-time as a construction worker for which Richard earned an average of $1,032 a month, that Richard's monthly personal living expenses were $1,060, that he had only $10.27 in a bank account, that he owned no real property, that his assets had a total value of only $8,885, and that Richard had total liabilities of $93,352 (including the remaining $50,000 to which Marilou was entitled under the divorce decree and not including any Federal income taxes, penalties, and interest owed to respondent).

The value or amount of Richard's limited assets and his liabilities, as reflected on the above September 28, 1998, financial statement is summarized below:

| Assets | Amount |
|---|---|
| Checking Account | $ 10 |
| 5 Shares of Stock in Central Maine Power Co. | 75 |
| Cash | 1,000 |
| 1986 Volkswagen | 1,500 |
| Tools | 3,300 |
| Household Items | 2,000 |
| Garden Tools | 1,000 |
| Total Assets | $ 8,885 |

| Liabilities | |
|---|---|
| Owed to Marilou per Divorce Decree | $52,000 |
| Equipment Loan | 22,353 |
| Student Loan | 17,315 |
| Personal Loan | 1,684 |
| Total Liabilities | $93,352 |

Richard's financial statement did not reflect the farm acreage and the residence acreage, consistent with Richard's claim that he had transferred his interests therein to his daughters.

Respondent's revenue officer undertook an investigation to verify the accuracy of the items reflected on Richard's financial statement. Among other things, the revenue officer contacted the Maine Department of Motor Vehicles to verify Richard's ownership of motor vehicles, and he contacted credit unions to verify the loans Richard had listed on the financial statement.

On October 5 and on November 9, 1998, respondent assessed the above Federal income tax liabilities that Richard had reflected on his late-filed Federal income tax returns for 1995 and 1996 ($28,336 and $20,238, respectively) and penalties associated therewith, for total taxes and penalties assessed for both years of $70,724, not including interest.

On approximately January 20, 1999, respondent's revenue officer investigated Richard's credit standing, met again with Richard, updated Richard's financial statement, and reviewed documents relating to Richard's and Marilou's divorce. On the updated financial statement, Richard reflected monthly income of zero, $1,000 in cash assets, and no other savings.

Throughout 1998 and 1999, and until May of 2000, and in spite of the above 1998 transfer of the residence acreage to Carrie and Marilou, Richard continued to live rent free in the home located on the residence acreage.

On or about May 10, 2000, Marilou and Carrie sold the residence acreage to an unrelated third party for a total sales price of $80,000. Of the net sales proceeds, Marilou received approximately $51,803 (relating to the $50,000-plus still due her under the 1994 divorce decree, which in turn related to her interests in the two parcels of real property), and Carrie received approximately $16,894 in cash, plus Carrie received (by deed from Marilou) Marilou's one-half interest in the 20-acre

carve out, and Carrie thereby became sole owner of the 20-acre carve out.

After the September 1998 sale of the farm acreage to Carrie, Tracy, and Deborah, and through the time of trial herein in 2004, the farm acreage has continued to be owned by Carrie, Tracy, and Deborah. Hay is grown, and cattle and horses belonging to Carrie, Tracy, and Deborah are grazed thereon.

After the May 2000 sale of the residence acreage to a third party and through the time of trial herein, Richard has continued to live either in a trailer home or in a workshop located on the 20-acre carve out owned by Carrie. The residence acreage that was sold in 2000 is still owned by the individuals who purchased it in 2000.

On June 23, 2000, in an effort to collect Richard's unpaid Federal income tax liabilities for 1995 and 1996, respondent, among other things, issued payment-due notices to Richard, filed tax liens against Richard, and mailed to Richard notices of intent to levy.

In July 2002, a valuation expert for respondent valued the farm acreage as of September 9, 1998, at a fair market value of $176,000.

As of August 6, 2002, the $23,278 for 1995 and $20,238 for 1996 in Federal income taxes that Richard owed and that had been assessed against Richard had not been paid, and respondent on

that date timely mailed to Carrie, Tracy, and Deborah notices of transferee liability in the respective amounts indicated below relating to Richard's outstanding Federal income tax liabilities, penalties, and interest, for 1995 and 1996:[5]

| Petitioner | Amount |
| --- | --- |
| Carrie H. Suchar | $51,394 |
| Tracy L. Suchar | 25,000 |
| Deborah R. Suchar | 25,000 |

In September 2002, at the request of Carrie, Tracy, and Deborah, a Maine certified general appraiser by the name of Laurent L'Heureux valued the farm acreage, as of September 9, 1998, at a fair market value of $87,000.

In December of 2002, Tracy and Deborah filed deeds transferring their interests in the farm acreage to Carrie.

OPINION

Under section 6901 and applicable State law or equity, respondent may be allowed to collect from a transferee of assets

---

[5] Because Richard's 1994 and 1995 Federal income tax returns were filed on Aug. 17 and Sept. 28, 1998, respectively, the periods of limitations with respect thereto for assessment of tax deficiencies would have expired on Aug. 17, 2001, and Sept. 28, 2001, respectively. Accordingly, under sec. 6901(c), the periods of limitations for assessment of transferee liability relating to those years would have expired on Aug. 17 and Sept. 28, 2002, respectively, one year after the period of limitations on assessment expired. Therefore, respondent's notices of transferee liability to Carrie, Tracy, and Deborah were issued timely on Aug. 6, 2002.

unpaid Federal taxes owed by a transferor of the assets.
Commissioner v. Stern, 357 U.S. 39, 45 (1958); Bresson v.
Commissioner, 111 T.C. 172 (1998), affd. 213 F.3d 1173 (9th Cir.
2000).

Section 6901 does not create a tax liability for the
transferee but only provides to respondent a secondary liability
in the transferee (which liability is therefore referred to as a
"transferee liability") or method by which respondent may collect
from the transferee unpaid taxes owed by the transferor.
Phillips v. Commissioner, 283 U.S. 589, 594 (1931); Mysse v.
Commissioner, 57 T.C. 680, 700-701 (1972).

Respondent bears the burden of proof with regard to asserted
transferee status under section 6901.  Sec. 6902(a); Rule 142(d).

Depending on the provisions of the particular State law and
the rules of equity that are involved in a case, factors
generally relevant in considering transferee liability have been
described as follows:

> (1) whether the transferees received property of the
> transferor; (2) whether the transfer was made without
> adequate consideration; (3) whether the transfer was made
> during or after the period for which the transferor's tax
> liability accrued; (4) whether the transferor was insolvent
> before or because of the transfer of property or whether the
> transfer of property was one of a series of distributions of
> property that resulted in the insolvency of the transferor;
> (5) whether all reasonable efforts to collect from the
> transferor were made and further collection efforts would
> have been futile; and (6) the value of the transferred
> property (which generally determines the limit of a
> transferee's liability).  Gumm v. Commissioner, 93 T.C. 475,

480 (1989), affd without published opinion, 933 F.2d 1014 (9th Cir. 1991).[6]

Here, the applicable State law is that of Maine, where the properties were located. Hagaman v. Commissioner, 100 T.C. 180, 186-187 (1993). Under Maine's Uniform Fraudulent Transfer Act (MUFTA), a transferee may be liable where either actual or constructive fraud was involved in a transfer. Me. Rev. Stat. Ann. tit. 14, secs. 3575.1(A) and 3576.1 (West 2003).

With respect to actual fraud, section 3575.1(A) of MUFTA provides that a debtor's transfer will be considered fraudulent as to a present or a future creditor if the debtor made a transfer with "actual intent to hinder, delay or defraud any creditor of the debtor".

With respect to constructive fraud, section 3576.1 of MUFTA provides that a debtor's transfer will be considered fraudulent as to a creditor whose claim arose before a transfer was made if the debtor made the transfer without receiving a reasonably equivalent value for the transfer and if the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.

---

[6] In Hagaman v. Commissioner, 100 T.C. 180, 183-186 (1993), State law provisions and situations are noted under which some of the listed factors relating to transferee liability may not be applicable.

The facts before us establish that Richard's transfers of his ownership interests in both the residence acreage and the farm acreage are to be treated as constructively fraudulent under Maine law vis-a-vis Richard's outstanding 1995 and 1996 Federal income taxes.

Richard's 1995 and 1996 Federal income tax liabilities arose as of the due date of the tax returns relating thereto, long before Richard in 1998 made the transfers at issue herein. Richard made the transfers in September of 1998, after respondent's revenue officer in April of 1998 had contacted Richard and made inquiry as to Richard's unpaid 1993 and 1994 tax liabilities and as to Richard's unfiled Federal income tax returns for 1995 and 1996.

In exchange for his one-half interests therein, Richard did not receive anywhere near the fair market value of the farm acreage and the residence acreage, and Richard clearly was made insolvent as a result of the transfers.

As of September of 1998, the total fair market value of the farm acreage was $176,000 (as explained infra pp. 22-24), and the fair market value of Richard's one-half interest therein was $88,000. For Richard's and Marilou's September 1998 transfers of their interests in the farm acreage to Carrie, Tracy, and Deborah, consideration was received of only $45,892, $30,000 of which was paid in cash to Marilou for Marilou's interest in the

farm acreage, and the farm acreage thereafter has remained in the hands of Richard's daughters.  With respect to <u>his</u> interest in the farm acreage, from the $45,892 consideration received, Richard received value or benefit of only $15,892 (relating to Richard's relief on the $12,589 mortgage liability and payment of the $3,303 in overdue real estate taxes).

The disparate amounts received by Richard and Marilou for their equal one-half interests in the farm acreage, among other things, establish that Richard did not receive fair market value for the transfer of his one-half interest in the farm acreage.

With regard to the residence acreage (which, as explained <u>infra</u> p. 24, both parties value at $16,984), the September 1998 warranty deed under which Richard transferred to Carrie his one-half interest in the residence acreage was made with no consideration received by Richard and with the obvious purpose of removing Richard's name from the property in order to keep the property within the family and beyond the reach of respondent's collection authority.

As of September of 1998, the fair market value of the 20-acre carve out was $20,000, and the fair market value of Richard's one-half interest therein was $10,000.

The preponderance of the evidence establishes that Richard's ownership interests in the farm acreage and in the residence acreage constituted Richard's only significant assets and that

the 1998 transfers of Richard's interests therein rendered Richard insolvent.  Richard's September 28, 1998, financial statements given to respondent showed that after the transfers Richard had assets of only $8,885 and liabilities of $93,352.

Respondent made reasonable efforts to collect from Richard his unpaid Federal income taxes for 1995 and 1996, and it is established that further collection efforts, apart from the instant transferee proceedings, would have been futile.

Petitioners contend that respondent has not established that Richard's transfers of his interests in the farm acreage and in the residence acreage were made to defraud respondent, that Richard's transfers to his daughters were made for less than full and adequate consideration, or that the transfers rendered Richard insolvent.  Further, petitioners contend that respondent has not established the value of the real property on the date of the transfers.

It is clear that, as of September 9, 1998, Richard's only significant assets were his one-half interests in the farm acreage and in the residence acreage that he transferred to his daughters.  The financial statement Richard submitted to respondent reflected a total value for Richard's other assets of less than $10,000.

Respondent's valuation expert, as of September of 1998, credibly valued the farm acreage at $176,000, based on a 5-lot

subdivision thereof as the highest and best use, and he valued the 20-acre carve out at $20,000.

Petitioners' expert claims that in 1998 a "glut" of land was available in and around China, Maine, resulting in a 10-year absorption period to sell the farm acreage. He therefore claims that the costs of any subdivision and the likely delay in the sale of any lots made any subdivision of the farm acreage not feasible and that the highest and best use of the farm acreage was as crop land with a September 1998 fair market value of only $87,000.

Our conclusion as to the September 9, 1998, fair market value of the farm acreage, the residence acreage, and the 20-acre carve out is based on the following additional factors:

(1) In the 1994 divorce proceedings, the divorce court established a total value for the farm acreage and the residence acreage of approximately $200,000;

(2) In August of 1997, the realtor on behalf of Richard and Marilou proposed a subdivision and development into residential lots of a portion of the farm acreage and selling the developed lots off for a total of approximately $265,000;

(3) During the years 1994 through 1998, real estate in the vicinity of the subject properties generally increased in value;

(4) In 1998, John's offer to purchase the farm acreage and Susan's purchase thereof, on behalf of Carrie, Tracy, and

Deborah, from Richard and Marilou for $45,000, occurred between related parties and was not based on any fair market valuation thereof, but rather was based on the amount Marilou was willing to accept to relinquish her one-half interest in the farm acreage;

(5) As set forth in respondent's expert's report, sales of comparable properties located in the vicinity of the subject properties support respondent's expert's fair market value for the farm acreage of $176,000;

(6) Petitioners' expert real estate appraisal of the farm acreage was based on properties not located within the reasonable vicinity of the subject properties and located in less desirable areas;

(7) Neither party submitted an expert appraisal of the residence acreage, and the parties appear to accept the $16,984 in cash that Carrie received in connection with the May 2000 sale of the residence acreage as indicative of the fair market value of the residence acreage, as of September 9, 1998, and of the fair market value of Richard's one-half interest therein that was transferred to Carrie; and

(8) With regard to the fair market value of Richard's one-half interest in the 20-acre carve out that he transferred to Carrie in 1998, respondent's expert appraised it at $10,000, and petitioners' expert did not opine as to its value.

With regard to consideration Richard received in connection with the September 1998 transfer of his one-half interest in the farm acreage, Marilou paid off Richard's liability under the divorce decree on $15,892 of mortgage debt and real estate taxes, for which $15,892 of consideration Richard is to receive credit.

We emphasize that the obligation Richard had under the divorce decree to Marilou was based on the anticipated sale by Richard of the entire property or on a transfer to Richard of Marilou's one-half ownership interests in the farm acreage and in the residence acreage. Since Richard never received Marilou's interests and since Marilou herself participated in the transfers of her interests therein to other individuals, Richard's obligations to Marilou under the divorce decree may be seen to have been extinguished as a result of the transfers at issue in this case. But such extinguishment is not properly regarded as consideration that Richard received for the transfer of his one-half ownership interests in the farm acreage and in the residence acreage. Rather, as stated, to the extent such extinguishment occurred here, it did so because Richard never received Marilou's ownership interests and because Marilou herself transferred her interests in the properties.

Petitioners argue that the September 9, 1998, transfers by Richard and Marilou of the residence acreage to Marilou and Carrie and of the farm acreage to Carrie, Tracy, and Deborah

reflected an effort simply to raise enough money to get Marilou off their backs, to get Marilou partially paid off amounts due her under the 1994 divorce decree, to avoid Richard's ending up in jail, and to keep the bulk of the family homestead within the family, and that there was no intent to defraud respondent.

We are not persuaded. It is clear that Marilou had no desire to retain an ownership interest in the farm acreage or in the residence acreage, and it is clear that Marilou was putting significant pressure on Richard to sell the properties, including her interests therein. That background explains the fact of the sale of the farm acreage and particularly the sale of Marilou's interest therein, but it does not explain the manner by which Richard's and Marilou's interests in the farm acreage were transferred or the amount of consideration received therefor, nor does it explain why Richard transferred his interest in the residence acreage for no consideration.

The evidence establishes that Richard's transfers to his daughters of his one-half interests in the farm acreage, the residence acreage, and the 20-acre carve out were made to place the properties beyond the reach of respondent's collection authority by removing Richard's name therefrom, while at the same time keeping the property within the family.

Summarized below are our conclusions, as of September of 1998, as to the fair market value of Richard's one-half interests

in the farm acreage, the residence acreage, and the 20-acre carve out, and the portion of such fair market value which Richard transferred to each of petitioners, namely, Carrie, Tracy, and Deborah, for no consideration.

|  |  | Transfer of Richard's One-Half Interests | | |
| Property | Fair Market Value | Value Received By | | |
|  |  | Carrie | Tracy | Deborah |
| Farm Acreage | $72,108* | $24,036 | $24,036 | $24,036 |
| Residence Acreage | 16,984 | 16,984 | --- | --- |
| 20-Acre Carve Out | 10,000 | 10,000 | --- | --- |
| Total Transferee Liability |  | $51,020 | $24,036 | $24,036 |

(*$88,000 less $15,892 equals $72,108)

The above amounts establish the transferee liabilities of Carrie, Tracy, and Deborah relating to Richard's Federal income tax liabilities for 1995 and 1996, including penalties.  The transferee liabilities of Carrie, Tracy, and Deborah accrue interest from the date of respondent's notices of transferee liability to each petitioner.[7]

Decisions will be entered

under Rule 155.

---

[7]  Under Maine law, respondent seeks interest relating to petitioners' transferee liabilities only from Aug. 6, 2002, the date of his notices of transferee liability to petitioners.  Me. Rev. Stat. Ann. tit. 14, sec. 1602; sec. 6601(e); Estate of Stein v. Commissioner, 37 T.C. 945, 959-961 (1962).